**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.** _____

BEVERLY BUNCHER,

        Plaintiff,

vs.

HAMLET AT POINCIANA CONDOMINIUM
ASSOCIATION, INC., and CENTURY
MANAGEMENT CONSULTANTS, INC.,

        Defendants.

_____/

**COMPLAINT AND DEMAND FOR JURY TRIAL**
**INJUNCTIVE RELIEF SOUGHT**

      COMES NOW Plaintiff, BEVERLY BUNCHER, by and through her undersigned counsel,

and sues the Defendants, HAMLET AT POINCIANA CONDOMINIUM ASSOCIATION, INC.,

and CENTURY MANAGEMENT CONSULTANTS, INC., and states as follows:

**I. NATURE OF THE ACTION**

1.     This is a civil action brought pursuant to the federal Fair Housing Act [hereafter "FHA"],

42 U.S.C. §§ 3601, *et seq.*, and 42 U.S.C. § 1982, for damages and injuries arising from the

Defendants, HAMLET AT POINCIANA CONDOMINIUM ASSOCIATION, INC.'s, and

CENTURY MANAGEMENT CONSULTANTS, INC.'s , unlawful discrimination against

Plaintiff, a person with a disability.

**II. PARTIES**

2.     Plaintiff, BEVERLY BUNCHER [hereafter "Plaintiff" and/or "BUNCHER"], a resident

and citizen of Palm Beach County, Florida, is an individual with a disability that qualifies her for

the protections of the FHA. Plaintiff currently resides at 6698 10th Ave., Apt. 318, Lake Worth, Florida 33467.

3.      Defendant HAMLET AT POINCIANA CONDOMINIUM ASSOCIATION, INC. [hereafter "Defendant" and/or "HAMLET" and/or "the Association"] is a Florida non-profit corporation, organized and operating pursuant to Chapter 718, Florida Statutes, with its principal place of business and current mailing address of 2950 Jog Road, Greenacres, FL 33467, which is responsible for administering, operating, and governing its housing complex pursuant to its Articles of Incorporation, Declaration of Condominium and By-Laws, its Rules and Regulations, and Amendments thereto. It also sets, approves, and enforces the policies, practices, rules, and regulations for the HAMLET Community.

4.      Defendant CENTURY MANAGEMENT CONSULTANTS, INC. [hereafter "Defendant" and/or "CMC"] is a Florida corporation having its main place of business in Palm Beach County, Florida. At all times relevant, CMC was HAMLET's property management agent for the HAMLET community, which included on-site administration and operation.

5.      The condominium units governed by HAMLET are "dwellings" within the meaning of 42 U.S.C. § 3602(b) of the FHA.

6.      HAMLET is subject to the anti-discrimination provisions of the FHA and amendments thereto.

7.      CMC is subject to the anti-discrimination provisions of the FHA and amendments thereto.

8.      HAMLET and CMC implemented and enforced policies that discriminated against BUNCHER with actual knowledge and/or reckless disregard of the illegality of their actions.

### III. JURISDICTION AND VENUE

2

9.      This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, 42 U.S.C. § § 3601, *et seq*. and § 3613.

10.     The Court has jurisdiction to declare the rights and legal relations of the parties and to order further relief pursuant to 28 U.S.C. §§ 2201 and 2202. The Court is authorized to issue preliminary injunctive relief and a temporary restraining order pursuant to Federal Rules of Civil Procedure 65(a) and 65(b), and to award relief under 42 U.S.C. § 300a-7(c) and (d), including but not limited to, damages and attorneys' fees.

11.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b) and 28 U.S.C. § 89(c) because Defendant resides in this District and the events giving rise to the Plaintiff's claims arose in Palm Beach County which is within the confines of the West Palm Beach Division of the Southern District of Florida.

12.     All conditions precedent to the bringing of this action by BUNCHER have occurred, or their performance has been waived by Defendants.

## IV. FACTUAL ALLEGATIONS

13.     BUNCHER owns, and at all times material hereto has owned or had a contract to buy, Unit 318, 6698 10th Avenue N., Lake Worth, FL 33467 located within the community HAMLET governs (hereafter "the Unit").

14.     At all times material hereto, BUNCHER suffered from, has a history of suffering from, and still suffers from mental impairments that substantially limit one or more of her major life activities. Accordingly, BUNCHER has a "handicap" pursuant to 42 U.S.C. § 3602(h), FHA.

15.     When BUNCHER and her husband purchased the Unit in February of 2022, BUNCHER relied on an assistance animal, a poodle named "Hercules."  Hercules assisted BUNCHER by providing emotional support that helped to ameliorate the symptoms of BUNCHER's anxiety.

16.     BUNCHER's husband also relied on an emotional support animal at the time their Unit was purchased.

17.     HAMLET does not allow pets.

18.     On January 21, 2022, Russell Donnelly, the then-President of the HAMLET Board of Directors [hereafter "DONNELLY"], insisted through CMC that BUNCHER needed to complete a form entitled "Service Animal/Emotional Support Animal Application." (January 21, 2022, email from DONNELLY to CMC employee/property manager Eduardo Romero [hereafter "ROMERO"], is marked and incorporated as "Exhibit 1.")

19.     According to DONNELLY, the form was needed "*for verification and approval by our legal staff.prior [sic] to interview appointment ,we [sic] are a no pet bldg and association and do not recognize esa animals , [sic] only State Certified support animals., if [sic] their application passes our legal review we will grant interview;*" [sic] *Id.*

20.     At all times relevant to this litigation, ROMERO was an employee of CMC and an agent of HAMLET.

21.     At all times relevant to this litigation ROMERO's acts and omissions as alleged herein took place in the course and scope of his employment as a property manager.

22.     The "Service Animal/Emotional Support Animal Application" form, marked and incorporated as "Exhibit 2," contained multiple illegal provisions, including:

   a)   A demand that a disabled individual sign a form providing her consent for "*an authorized representative*" of HAMLET to directly contact her health care provider;

   b)   A form to be completed by a disabled individual's health care provider stating that an assistance animal is "*medically necessary*" and attestation that the health care provider's "*statement is made to induce Hamlet at Poinciana Condominium*

*Association, Inc. to make substantial and material alterations to the Association's use restrictions based upon a medical, mental and/or physiological disability/handicap;"*

c) A requirement that the applicant "*provide updated information concerning his/her disability (if such disability is not permanent)…[and] all certifications or trainings the animal possesses, as required by the board;"*

d) The statement that:

> *Please be advised that this Association has strict rules regarding animals and pets within the community, and the Association is required by law to enforce these rules. Many people chose to move into this community because they have allergies or other health issues related to animals*; and

e) A warning to:

> **Please be aware that some disabilities may be temporary and resolve in time. When that is the case, YOU WILL BE REQUIRED TO REMOVE THE ANIMAL FROM THE HOME after periodic renewal and finding that the disability no longer exists.**

*Id.* (emphasis in the original).

23.     On January 24, 2022, BUNCHER provided HAMLET with a letter from her psychologist James B. Campbell, Psy.D. attesting that BUNCHER suffers from a disability and that BUNCHER required the ability to live with Hercules to mitigate the symptoms of her disability. She also provided information regarding her emotional support animal's vaccines and his photo. (January 24, 2022, submission regarding BUNCHER's need for waiver of the no-pet rule is marked and incorporated as "Exhibit 3.") Information was also provided at that time in support of BUNCHER's husband's need for his emotional support animal.

24.     The information provided by BUNCHER in Exhibit 3 was apparently deemed insufficient, and on January 25, 2022, ROMERO emailed BUNCHER and her husband the "Service

Animal/Emotional Support Animal Application" form again, instructing: "Please fill the application completely for each pet[1]."

25.     Anxious to close on the Unit per the purchase agreement, BUNCHER and her husband capitulated and provided the forms demanded, including the form consenting to their health care providers being contacted by HAMLET. (January 25, 2022, executed consent to contact health care provider is marked and attached as "Exhibit 4.")  In lieu of the "Statement of Qualifying Health Professional," BUNCHER again provided the letter signed by Dr. James B. Campbell, Psy.D. along with her executed "Service Animal/Emotional Support Animal Application."

26.     On January 26, 2022, BUNCHER's realtor notified ROMERO in writing that the BUNCHER's loan was approved, the sellers had vacated the Unit, and the closing could take place as early as January 31, 2022.

27.     The purchase agreement required that the closing take place no later than February 4, 2022.

28.     The February 4, 2022, closing date had been reported on the BUNCHERs' Application for Purchase submitted to HAMLET on January 3, 2022.

29.     Knowing that BUNCHER was required to close before February 4, 2022, on February 1, 2022, DONNELLY emailed ROMERO that "[b]ecause of the complexity of purchase of 318 we will not be able to do interview until the week of February 6th, 2022, the Hamlet Board will let you know," [sic]. (February 1-2, 2022, Realtor, DONNELLY and ROMERO email exchange is marked and incorporated as "Exhibit 5.")

30.     DONNELLY's February 1, 2022, email was forwarded to the BUNCHERs' realtor who noted his failure "to see what is complicated about this," pointed out that HAMLET's declaration

---

[1] Assistance animals, including emotional support animals, are not "pets."

permitted only fifteen (15) days for approval, that the application and psychologist's letters had been submitted twenty-nine days ago (and thus one day shy of 30 days), and asked that ROMERO "[p]lease do take into consideration that this delay is unnecessary and is providing undue hardship to the Bunchers, who are a delightful couple and will be a tremendous asset to the Hamlet community." (*Id.*)

31.    On February 2, 2022, two days before the scheduled closing, DONNELLY emailed property manager ROMERO with yet another form and instructions that it be completed by BUNCHER and her husband, specifically: "*an acknowledgement that they have reviewed and accepted the Hamlet Guidelines and Rules concerning ESA animals on Hamlet property*," and insisted that the form "*must be signed to schedule and complete interview process*." (*Id.*) (The new form, entitled "HAMLET AT POINCIANA CONDOMINIUM ASSOCIATION, INC. GUIDELINES AND RULES FOR EMOTIONAL SUPPORT ANIMALS AND SERVICE ANIMALS" [hereafter "new form"], is marked and incorporated as "Exhibit 6.")

32.    The new form stated that if a resident is "approved by the Board to keep and Emotional Support Animal or a Service Animal Approval," the resident must carry his or her assistance animal "on the Hamlet catwalks or property" and "when on the Hamlet Elevators" and that the animal must be "carried off the property to do their daily business" and that the animal "is not permitted on any Hamlet easement outside of the unit." (*Id.)*

33.    The new form further warned:

> Any non-compliance with the above rules will make you as a homeowner subject to appropriate fines by the Board of Directors of the Hamlet <u>at the maximum fine amount permitted by law.</u>

<u>*Id.*</u> (emphasis in the original).

34.     On February 3, 2022, BUNCHER's counsel emailed ROMERO a letter explaining that HAMLET's demand that BUNCHER complete a specific form to request an accommodation was illegal, as was demanding consent to contact her healthcare provider and requiring disabled residents to carry their assistance animals when outside their units. The letter advised that legal action would be taken if BUNCHER and her husband were not interviewed within 24 hours so that the closing could take place as scheduled. (February 3, 2022, letter from BUNCHER's counsel is marked and incorporated herein as "Exhibit 7.")

35.     Neither HAMLET's board president nor ROMERO replied to BUNCHER's counsel. Instead, on February 4, 2022, apparently incensed by BUNCHERs' realtor's observation that HAMLET appeared to have revised its rules because of the BUNCHERs' requests for accommodation, emailed the realtor an indignant rant, again emphasizing how very unwelcome disabled residents with assistance animals are at the HAMLET:

> In response to Fleur Real Estate accusation that we are making up rules as we go along.....
>
> Fleur I didn't know that you were also a psychic along with being a real estate broker. These rules were developed for your information in Feb. 2021. it is just presently that we have had to utilize them because of the situation you created by insisting on bringing clients with pets. I would say this, you did not enter this blindly, you knew what could happen, personally I think it was a disservice to your clients when there are a number of associations here at Poinciana that allow pets. The issue is that you are trying to close two doors at the same time. Presently the only adjustment to the rules, that you erroneously concluded were just made, was a review by our law firm to make sure that the Hamlet Guidelines and Rules were correctly stated and within the law when presented to your clients, by the way these rules are not presented until the client passes ESA certification by our legal team, presenting them up front serves no purpose if the applicants fail certification. Next, the weight of the animals in question is bizarre for you to even bring up, your clients pets in question can't be more than 5 lbs, I didn't see an over weight chihuahua in the picture and this requirement doesn't apply to seeing eye dogs, they are actual support animals and are

necessary to lend support to their handicapped owner an ESA animal on the other hand is for comfort only and doesn't provide any physical support to anyone. If they want to pursue hardship then they can and if they satisfy the requirements  they would be granted reasonable accommodation, but their disability is not physical.

Their papers are in order for an ESA animal, which we will respect, but if they truly want to live here they will have to acknowledge the rules of the Hamlet and abide by them, not signing them is like telling us they do not want to be responsible for the animals future conduct. Lets [sic] face it the probability of noise is high with the presence of two animals, in one unit, and up front the Hamlet will not tolerate that at all. Many residents have already emailed me that the no pet policy was a major reason they purchased here and actually feel threatened by the turn of events. What you are trying to do is respect one persons [sic] desires and needs over another's, we have the right to enforce our Community Rules. Everyone living here knew up front that this was a no pet building and acknowledged it when they purchased their unit. Fleur this is our process, you may not like it but you don't have to, it's our process not yours. Complete the process and we can move on.

Fleur get things straight.
Russ Donnelly

(February 4, 2022, DONNELLY email is marked and incorporated as "Exhibit 8.")

36.     As a direct result of HAMLET's and/or CMC's actions, the BUNCHERs had to seek extension of the closing on their Unit  and were able to obtain a new closing date of  February 15, 2022.

37.     As the lease on their then-current residence was expiring, and increasingly desperate for the closing to take place, on February 8, 2022, BUNCHER and her husband capitulated to the HAMLET's (illegal) demand and signed the GUIDELINES AND RULES FOR EMOTIONAL SUPPORT ANIMALS AND SERVICE ANIMALS so that they could finally close on February 10, 2022.

38.     Though extremely inconvenient and burdensome, BUNCHER adhered to HAMLET's rule that her emotional support not be walked on the premises by, *inter alia*, obtaining a stroller and placing Hercules in it and taking him off HAMLET property to relieve himself.

39.     Hercules died on December 15, 2024.

40.     To help her cope with Hercules' death and manage the ongoing symptoms of her anxiety, BUNCHER obtained "Bella" for emotional support.

41.     Bella came home with BUNCHER in late 2024. BUNCHER spoke with Rhonda Borean ("BOREAN"), a member of HAMLET's Board of Directors and HAMLET's designated "Community Relations" coordinator, explaining that that Bella was her new emotional support animal in the wake of Hercules' passing.

42.     On January 10, 2025, BOREAN emailed BUNCHER:

> Hello Beverly & Alan,
>
> I spoke with the Board and they confirmed that you have to contact Eduardo at CMC Management to get the paperwork required to have your new dog approved to come into the community.
>
> I was also informed that you are not allowed to have the dog on the premises until the paperwork is completed and approved by CMC Management. Apparently you were told this when getting approval for your last two dogs. The fact that they passed away doesn't automatically approve your new dog.
>
> My apologies for having to pass on this bad news for you. I don't make the rules and am just the messenger. Is there someone who can care for the dog for you until you receive approval? I'd hate to see you not get approved because the rules weren't followed.
>
> Rhonda Borean
> Hamlet Community Relations

(January 10-13, 2025, Borean, Plaintiff, and Romero email exchanges is marked and incorporated collectively as "Exhibit 9.")

43.     On January 13, 2025, BUNCHER emailed ROMERO (and copied BOREAN) Bella's photo and vaccine records, reminding them she had already been granted an accommodation for an emotional support animal:

> Dear Eduardo and Rhonda,
>
> Unfortunately, our two prior ESA's Hercules and Maxie both passed in 2024.
>
> As we all know, we have been approved for up to two ESA's here at the Hamlets and are legally required to give you shot records. At this time, we have one ESA.
>
> This letter is written to provide the annual dog shots record for and a picture of our new ESA Bella.
>
> Please confirm receipt. Thank you.

44.     On January 13, 2025, BOREAN replied: "[D]did you get and fill out the form from CMC? I didn't see it in your last attachment." BUNCHER again responded (copying ROMERO) that she had "already been approved for an ESA and continue[d] to receive therapeutic care," and further explained that "the law only requires that we let you know when we get a new ESA and provide shot records for our ESA. We also included a picture. Thanks, Bev". (*Id.)*

45.     On January 13, 2025, ROMERO replied: "We need you to please fill the whole paperwork. See attached." (*Id.*) Two documents were attached to the email: (1) a document containing text in strike-through, underline format entitled "Hamlet Guidelines and Rules for <u>EMOTIONAL SUPPORT</u>~~SA~~ <u>ANIMALS AND SERVICE ANIMALS</u>~~Animals, (~~marked and incorporated herein as "Exhibit 10") , and (2) a  document entitled "<u>SERVICE ANIMAL/EMOTIONAL SUPPORT ANIMAL APPLICATION</u>," ("APPLICATION") (marked and incorporated herein as "Exhibit 11").

46.     The APPLICATION warns applicants: "**NOTE: Falsely representing an animal as a service animal or as an emotional support animal is a crime under Florida law**." (*Id.* (emphasis in the original).)

47.     Like HAMLET's previous illegal policy, the APPLICATION purports to require a disabled resident or potential resident seeking permission to reside with an emotional support animal to sign a Release authorizing a HAMLET representative to speak with his/her healthcare provider, requires disabled residents to "provided updated medical information concerning his/her disability" whenever the Board requires,  advises that "this Association has strict rules regarding animals and pets within the community," and claiming that "the Association is required by law to enforce these rules..."

48.     HAMLET'S current APPLICATION also contains a form demanding that a disabled individual's mental or medical health care provider attest that an assistance animal is "medically necessary" and warns (emphasis in original):

> **Please be aware that some disabilities may be temporary and resolve in time. When that is the case, YOU WILL BE REQUIRED TO REMOVE THE ANIMAL FROM THE HOME after periodic renewal and finding that the disability no longer exists.**

(*Id.* (emphasis in the original).)

49.     On January 28, 2025, BUNCHER's counsel again attempted to educate HAMLET regarding its obligations to accommodate disabled residents that need to reside with assistance animals. (January 28, 2025, pre-suit notice is marked and incorporated herein as "Exhibit 12.")

50.     Although ROMERO acknowledged receipt of the correspondence, there has been no substantive response to BUNCHER's counsel by ROMERO, CMC, or anyone else associated with HAMLET.

51.     On March 26, 2025, BUNCHER met with the then president of HAMLET's Board of Directors to discuss HAMLET's policies regarding assistance animals as well as the restrictions imposed upon disabled residents that rely on assistance animals.

52.     The then Board president insisted that a letter verifying a need for an emotional support animal must be renewed on an annual basis and that HAMLET is within its rights when mandating that assistance animals cannot walk on much less urinate on HAMLET's property.[2]

53.     Defendants HAMLET and CMC have interfered, coerced, and intimidated BUNCHER in the exercise of her fair housing rights.

54.     BUNCHER has been injured by HAMLET's discriminatory housing practices, as well as by CMC's enforcement thereof, and therefore qualifies as an "aggrieved person" pursuant to 42 U.S.C. § 3602(i).

55.     HAMLET's and CMC's actions are motivated by evil motive or intent, or involve reckless or callous indifference to BUNCHER's federally-protected rights insofar as HAMLET and CMC have been informed that its actions are in violation of federal law.

56.     As a direct and proximate result of the Defendants' conduct, BUNCHER has incurred and continues to incur attorney's fees, and has suffered and continues to suffer irreparable loss and injury including, but not limited to, mental anguish, loss of dignity, emotional distress, humiliation, and loss of his right to equal housing opportunities regardless of disability.

---

[2] At the time of the filing of this pleading, HAMLET has a new Board president that has retracted the rule that an emotional support animals' paws must never touch HAMLET common grounds and posted a sign informing residents that "all ESA animals (sic) are allowed to walk with their owners on property so long as they are on leash." However, HAMLET's rules have not been amended and still provide that an ESA or service animal must be carried when on Hamlet property or in an elevator and cannot "do their business" on the property.

57.     BUNCHER retained undersigned counsel and is obligated to pay a reasonable fee for their services.

## V. CAUSES OF ACTION

### COUNT 1
### FAILURE TO ACCOMMODATE

58.     Plaintiff re-alleges and incorporate by reference Paragraphs 1-57 as if fully set forth herein.

59.     BUNCHER suffers from a mental health impairment that substantially limits BUNCHER's one or more of her major life activities.

60.     BUNCHER has an emotional support animal that helps ameliorate the symptoms of her disability by reducing her anxiety.

61.     BUNCHER has a disability-related need to live with her emotional support animal to have equal use and enjoyment of her Unit in HAMLET.

62.     HAMLET and CMC were provided credible documentation establishing BUNCHER has a disability requiring she live with an animal that provides her disability-related emotional support.

63.     HAMLET and CMC have actual knowledge of BUNCHER's disability-related need to live with her emotional support animal.

64.     HAMLET and CMC illegally demanded BUNCHER sign a release authorizing HAMLET to contact her mental health care provider and demanded that BUNCHER sign the Assistance Animal Policy reserving to HAMLET the ability to arbitrarily demand she prove she is still disabled whenever the Board wishes, refrain from walking her emotional support animal on HAMLET's property and carry her emotional support animal anytime she is outside her Unit accompanied by her emotional support animal.

65.     The policy BUNCHER was required to sign threatens that any "non-compliance" with HAMLET's rules for emotional support animals would subject her "to appropriate fines by the

Board of Directors of the Hamlet <u>at the maximum fine amount permitted by law</u>" (emphasis in the original).

66.    Persons with disabilities are entitled to the same access to HAMLET's common areas as any non-disabled resident, regardless of whether accompanied by an assistance animal.

67.    An accommodation that requires an assistance animal to be carried whenever it is not inside the owner's unit and/or taken off property to relieve itself is not a reasonable accommodation.

68.    HAMLET's discriminatory policies and conduct, implemented by CMC, constitute a conscious and reckless disregard for BUNCHER's rights and show total indifference to BUNCHER's disabilities.

69.    HAMLET and CMC violated 42 U.S.C. § 3604(f)(3)(B) by failing to make reasonable accommodations in the rules, policies, practices, and/or services when such accommodations are necessary to afford BUNCHER an equal opportunity to use and enjoy a dwelling.

70.    Defendants' discriminatory conduct is intentional, willful, and/or otherwise taken in reckless disregard for BUNCHER's rights.

71.    As a direct and proximate result of Defendants' failure to accommodate, BUNCHER incurred attorney's fees and suffered irreparable loss and injury including, but not limited to, mental anguish, loss of dignity, emotional distress, humiliation, and loss of her right to equal housing opportunities regardless of disability.

**WHEREFORE,** Plaintiff, BEVERLY BUNCHER, demands judgment against Defendants, HAMLET AT POINCIANA CONDOMINIUM ASSOCIATION, INC. and CENTURY MANAGEMENT CONSULTANTS, INC., declaring that they violated, *inter alia*, the Fair Housing Act/Fair Housing Amendments Act by discriminating against a person with a disability,

and awarding Plaintiff compensatory damages, punitive damages, attorneys' fees and costs, and injunctive relief, as well as any other relief as this Court deems just and equitable.

**COUNT 2**
**ILLEGAL INTIMIDATION - ASSISTANCE ANIMAL POLICY**

72.   Plaintiff re-alleges and incorporates by reference Paragraphs 1-57 as if fully set forth herein.

73.   Pursuant to 42 U.S.C. § 3617, it is unlawful "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 42 U.S.C.S. §§ 3603, 3604, and 3606."

74.   HAMLET adopted and enforced policies that are clearly intended to discourage residents and potential residents from requesting a waiver of the no-pet rule for assistance animals.

75.   CMC implemented policies that are clearly intended to discourage residents and potential residents from requesting a waiver of the no-pet rule for assistance animals

76.   HAMLETS's SERVICE ANIMAL/EMOTIONAL SUPPORT ANIMAL APPLICATION attempts to intimidate disabled individuals by warning them that "**Falsely representing an animal as a service animal or as an emotional support animal is a crime under Florida law.**"

77.   By adopting and implementing its Assistance Animal Policy and providing BUNCHER an application to sign warning BUNCHER that it is a crime to misrepresent the need for an emotional support animal, Defendants violated 42 U.S.C. § 3617 of the FHA by attempting to intimidate BUNCHER, other residents, and potential residents from exercising and enjoying their fair housing rights.

78.   Requiring BUNCHER to sign to a document which threatens that any "non-compliance" with HAMLET's rules for emotional support animals would subject her "to appropriate fines by

the Board of Directors of the Hamlet <u>at the maximum fine amount permitted by law</u>" (emphasis in the original), is a threat against BUNCHER made by Defendants because she exercised her right to request an accommodation for her emotional support animal.

79.    Defendants' threats against and attempt to intimidate BUNCHER were intentional, willful, and/or otherwise taken in reckless disregard for Plaintiff's rights.

80.    As a direct and proximate result of the Defendants' conduct, the Plaintiff has incurred and continues to incur attorney's fees, and suffered and continues to suffer irreparable loss and injury including, but not limited to, mental anguish, loss of dignity, emotional distress, humiliation, and loss of his right to equal housing opportunities regardless of disability.

**WHEREFORE,** Plaintiff, BEVERLY BUNCHER, demands judgment against Defendants, HAMLET AT POINCIANA CONDOMINIUM ASSOCIATION, INC. and CENTURY MANAGEMENT CONSULTANTS, INC., declaring that they violated, *inter alia*, the Fair Housing Act/Fair Housing Amendments Act by discriminating against a person with a disability, and awarding Plaintiff compensatory damages, punitive damages, attorneys' fees and costs, and injunctive relief, as well as any other relief as this Court deems just and equitable.

**COUNT 3**
**PUBLISHING A STATEMENT INDICATING A PREFERENCE THAT**
**PERSONS WITH DISABILITIES NOT RESIDE**
**AT HAMLET AT POINCIANA CONDOMINIUM ASSOCIATION, INC.**

81.    Plaintiff re-alleges and incorporates by reference Paragraphs 1-57 as if fully set forth herein.

82.    Pursuant to 42 U.S.C. § 3604(c) it is unlawful for HAMLET to "make, print or publish any notice, statement or advertisement with respect to the sale or rental of a dwelling that indicates any preference, limitation or discrimination based upon on race, color, religion, sex, handicap, familial

status, or national origin, or an intention to make any such preference, limitation, or discrimination."

83.    HAMLET's <u>SERVICE ANIMAL/EMOTIONAL SUPPORT ANIMAL APPLICATION</u> "advises that this Association has strict rules regarding animals and pets within the community, and the Association is required by law to enforce these rules…"

84.    HAMLET's <u>SERVICE ANIMAL/EMOTIONAL SUPPORT ANIMAL APPLICATION</u> blatantly insinuates that persons with disabilities that need assistance animals are not desirable as residents.

85.    BUNCHER was given documents by CMC in conjunction with the purchase of her Unit illegally indicating a preference on the basis of a protected class, disability.

86.    The discriminatory conduct of HAMLET and CMC was intentional, willful, and/or otherwise taken in reckless disregard for Plaintiff's rights.

87.    As a direct and proximate result of the Defendants' conduct, the Plaintiff has incurred and continues to incur attorney's fees, and suffered and continues to suffer irreparable loss and injury including, but not limited to, mental anguish, loss of dignity, emotional distress, humiliation, and loss of her right to equal housing opportunities regardless of disability.

**WHEREFORE,** Plaintiff, BEVERLY BUNCHER, demands judgment against Defendants, HAMLET AT POINCIANA CONDOMINIUM ASSOCIATION, INC. and CENTURY MANAGEMENT CONSULTANTS INC., declaring that they violated, *inter alia*, the Fair Housing Act/Fair Housing Amendments Act by publishing statements indicating persons with disabilities are unwanted at HAMLET AT POINCIANA CONDOMINIUM ASSOCIATION, INC., and awarding Plaintiff compensatory damages, punitive damages, attorneys' fees and costs, and injunctive relief, as well as any other relief as this Court deems just and equitable.

## COUNT 4
## DISCRIMINATING IN THE PROVISION OF SERVICES
## OR FACILITIES IN CONNECTION WITH A DWELLING

88.     Plaintiff re-alleges and incorporates by reference Paragraphs 1-57 as if fully set forth herein.

89.     Pursuant to 42 U.S.C. § 3604(f)(2) it is unlawful for HAMLET to "To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap..."

90.     HAMLET required persons with disabilities in need of assistance animals, both service and emotional support animals, to carry or otherwise transport their assistance animals such that the animals' paws did not touch HAMLET's community property, including and especially common areas of the HAMLET property, and to take assistance animals off property to relieve themselves.

91.     HAMLET's current rules, regulations, and by-laws still require disabled residents to carry their assistance animals and take them off the premises to urinate or defecate.

92.     BUNCHER was given documents by CMC in conjunction with the purchase of her Unit ordering that she comply with such illegal requirements.

93.     The discriminatory conduct of HAMLET and CMC was intentional, willful, and/or otherwise taken in reckless disregard for Plaintiff's rights.

94.     As a direct and proximate result of the Defendants' conduct, the Plaintiff has incurred and continues to incur attorney's fees, and suffered irreparable loss and injury including, but not limited to, mental anguish, loss of dignity, emotional distress, humiliation, and loss of her right to equal housing opportunities regardless of disability.

**WHEREFORE,** Plaintiff, BEVERLY BUNCHER, demands judgment against Defendants, HAMLET AT POINCIANA CONDOMINIUM ASSOCIATION, INC. and CENTURY MANAGEMENT CONSULTANTS INC., declaring that they violated, *inter alia*, the Fair Housing Act/Fair Housing Amendments Act by publishing statements indicating persons with disabilities are unwanted at HAMLET AT POINCIANA CONDOMINIUM ASSOCIATION, INC., and awarding Plaintiff compensatory damages, punitive damages, attorneys' fees and costs, and injunctive relief, as well as any other relief as this Court deems just and equitable.

## VI.  THIS COURT'S POWER TO GRANT RELIEF

95.     Plaintiff re-alleges and incorporates by reference Paragraphs 1 through 57, as if fully set forth herein.

96.     Plaintiff has suffered and incurred irreparable damage, and continues to suffer and incur irreparable damage.

97.     The FHA and Rule 65 of the Federal Rules of Civil Procedure, collectively and singularly, empower this Court to grant a temporary restraining order, preliminary injunctive and permanent injunctive relief, and/or such other relief as the Court may deem appropriate to hold and redress the violations of any provision of law enforced by the FHA. The Court, in the exercise of its equitable jurisdiction may award financial relief, accommodation directives, policy modification, and restoration of access privileges to prevent and remedy any violation of any provision of law enforced by the FHA

## VII. PRAYER FOR RELIEF

WHEREFORE**,** Plaintiff, BEVERLY BUNCHER, demands judgment against Defendant HAMLET AT POINCIANA CONDOMINIUM ASSOCIATION, INC. and against Defendant CENTURY MANAGEMENT CONSULTANTS, INC. and respectfully requests that this Court enter an Order:

a) declaring that the actions of HAMLET AT POINCIANA CONDOMINIUM ASSOCIATION, INC. and CENTURY MANAGEMENT CONSULTANTS, INC. violated, *inter alia*, the Fair Housing Act/Fair Housing Amendments Act by discriminating against persons with a disability;

b) issuing an injunction enjoining and prohibiting HAMLET AT POINCIANA CONDOMINIUM ASSOCIATION, INC. and CENTURY MANAGEMENT CONSULTANTS, INC., including but not limited to their Association members, future members, Board of Directors, Officers, property managers, employees, agents, volunteers, interns, attorneys, and representatives, from removing, tampering with, altering, inhibiting, precluding, depriving, limiting, or otherwise interfering with BUNCHER's occupancy of her Unit and/or the presence of her emotional support animal at HAMLET AT POINCIANA CONDOMINIUM ASSOCIATION, INC.;

c) entering an injunction enjoining and prohibiting Defendants HAMLET AT POINCIANA CONDOMINIUM ASSOCIATION, INC. and CENTURY MANAGEMENT CONSULTANTS, INC. from discriminating against any person based upon handicap by refusing to make a reasonable accommodation when such accommodation may be necessary to afford a person with a handicap an equal right to enjoy a dwelling or by requiring persons to acknowledge and sign terms of residency that are not in compliance with the FHA;

d) entering an injunction enjoining and prohibiting Defendants HAMLET AT POINCIANA CONDOMINIUM ASSOCIATION, INC. and CENTURY MANAGEMENT CONSULTANTS, INC. from continuing to use documents that

indicate a preference that persons who need assistance animals are not welcome to live at HAMLET AT POINCIANA CONDOMINIUM ASSOCIATION, INC.;

e)  issuing an injunction enjoining and prohibiting HAMLET AT POINCIANA CONDOMINIUM ASSOCIATION, INC. and CENTURY MANAGEMENT CONSULTANTS, INC. from requiring persons with disabilities to sign medical releases or prove anew that they require an accommodation, either annually, periodically, or at the whim of the Board;

f)  awarding to Plaintiff such damages as would fully compensate her for her injuries caused by the discriminatory conduct of HAMLET AT POINCIANA CONDOMINIUM ASSOCIATION, INC. and CENTURY MANAGEMENT CONSULTANTS, INC.;

g)  awarding to Plaintiff punitive damages;

h)  awarding to Plaintiff her attorney's fees and costs incurred in bringing this action and associated and affiliated with enforcement of the FHA and otherwise associated with her protection thereunder; and

i)  granting all other relief as this Court deems just and equitable.

## VIII.   DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all issues so triable.

Respectfully submitted,

VENZA LAW, PLLC
12161 Mercado Drive, #227
Venice Beach, FL 33409-1147
Office: (561) 596-6329
Email: dvenza@venzalawpllc.com

MARCY I. LAHART, PLLC
861 S. 40th Street
Tacoma, WA 98418
Telephone: (352) 545-7001
Facsimile: (888) 400-1464
Email: marcy@doglaw.co

BY: *s / Denese Venza*
Denese Venza, Esq.
Florida Bar No. 0599220
*Counsel for Plaintiff*

BY: *s/ Marcy I. LaHart*
Marcy I. LaHart, Esq.
Florida Bar No. 0967009
*Counsel for Plaintiff*